# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Mark Falk |
| v. | : | Mag. No. 19-3507 |
| GENE LEVOFF | : | **CRIMINAL COMPLAINT** |

I, Robert M. Napolitano, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation and that this Complaint is based on the following facts:

SEE ATTACHMENT B

continued on the attached page and made a part hereof.

Special Agent Robert M. Napolitano
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,
February 13, 2019 at Newark, New Jersey

HONORABLE MARK FALK
UNITED STATES MAGISTRATE JUDGE       Signature of Judicial Officer

## ATTACHMENT A

## Count One
## (Securities Fraud)

From in or around February 2011 through in or around April 2016, in Hudson County, in the District of New Jersey, and elsewhere, defendant

## GENE LEVOFF

did unlawfully, willfully, and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and the mails and of the facilities of national securities exchanges, in connection with the purchase and sale of securities, use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit: by executing and causing others to execute securities transactions in the securities of Company-1 on the basis of material nonpublic information concerning Company-1 in breach of a duty of trust and confidence that was owed directly, indirectly, and derivatively to the issuers of those securities, the shareholders of the issuers, and to other persons who were the source of the material nonpublic information.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5 and 240.10b5-2, and Title 18, United States Code, Section 2.

## ATTACHMENT B

I, Robert M. Napolitano, am a Special Agent with the Federal Bureau of Investigation ("FBI"). I am fully familiar with the facts set forth herein based on my own investigation, my conversations with law enforcement officers, witnesses, and others, and my review of reports, documents, and items of evidence. Because this Complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where statements of others are related herein, they are related in substance and in part. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged. All times are approximate and, unless otherwise noted, are in the Pacific Time Zone.

## Background Information

1. At all times relevant to this Complaint:

   a. Company-1 was a global technology company headquartered in Cupertino, California that designed, developed, and sold consumer electronics, computer software, and online services. Company-1 was a publicly traded company whose securities were listed on the NASDAQ Stock Market. In terms of market capitalization, Company-1 was consistently among the most valuable companies in the world.

   b. Defendant GENE LEVOFF ("LEVOFF") was employed by Company-1 at its headquarters in Cupertino. From in or around 2008 through in or around 2013, LEVOFF, an attorney, was the Director of Corporate Law at Company-1. From in or around 2013 through his termination in or around September 2018, LEVOFF was the Senior Director of Corporate Law at Company-1. In that role, LEVOFF functioned as the top corporate attorney at Company-1, reporting directly to Company-1's General Counsel. Among other things, LEVOFF was responsible for overseeing Company-1's compliance with securities laws, which included advising others regarding U.S. Securities and Exchange Commission (the "SEC") filings and financial reporting. In or around February 2018, Company-1 named LEVOFF its Corporate Secretary, a title he maintained until his termination. Before that, LEVOFF held the role of Assistant Secretary. From in or around September 2008 through in or around July 2018, LEVOFF served on Company-1's Disclosure Committee, and, as a result, had access to and obtained Company-1's draft SEC filings and earnings materials before Company-1 disclosed its quarterly and yearly financial results to the public. LEVOFF served as one of the Disclosure Committee's co-chairpersons from in or around December 2012 through in or around July 2018.

  c. First Republic Securities Company, LLC ("First Republic") was a brokerage firm based in San Francisco, California that provided various investment services, including online investing. LEVOFF maintained an account with First Republic (the "First Republic Account") that he used, among other things, to buy and sell securities, including Company-1 stock.

  d. TD Ameritrade was a brokerage firm based in Omaha, Nebraska that provided online investing services for institutions and individuals. LEVOFF maintained a brokerage account with TD Ameritrade (the "TD Ameritrade Brokerage Account") that he used, among other things, to buy and sell securities, including Company-1 stock.

  e. Virtu Americas, LLC, f/k/a KCG Americas LLC, f/k/a Knight Capital Markets ("Virtu") was a market maker – i.e., a firm that stands ready to buy and sell a particular stock on a regular and continuous basis at a publicly quoted price, thus providing liquidity to the market. The servers that housed Virtu's electronic trading systems and executed trades involving those systems were located in Jersey City, New Jersey.

  f. Susquehanna International Group, f/k/a G1 Execution Services, LLC ("G1") was a market maker. The servers that housed G1's electronic trading systems and executed trades involving those systems were located in Secaucus, New Jersey.

  g. BNY Mellon Capital Markets, LLC ("BNY Mellon") was a market maker. The third-party affiliate servers that housed BNY Mellon's electronic trading systems were located in Carteret, New Jersey.

  h. Two Sigma Securities, LLC ("Two Sigma") was a market maker. The servers that housed Two Sigma's electronic trading systems and executed trades involving those systems were located in Secaucus, New Jersey.

### The Insider Trading Scheme

2. From in or around February 2011 through in or around April 2016, LEVOFF orchestrated a scheme to defraud Company-1 and its shareholders by misappropriating material nonpublic information regarding Company-1's financial results in order to execute favorable trades involving the securities of Company-1. These trades caused LEVOFF to realize profits of approximately $227,000 and to avoid losses of approximately $377,000.

3. In particular, LEVOFF used his position as a member and/or an invitee of Company-1's Disclosure Committee to obtain material nonpublic information regarding Company-1's financial results before Company-1 disclosed that information to the public.

4. LEVOFF converted the material nonpublic information to his own use by executing trades involving Company-1 stock in the TD Ameritrade Brokerage Account and/or the First Republic Account before Company-1 disclosed its financial results to the public. When LEVOFF discovered that Company-1 had posted strong revenue and net profit for a given financial quarter, he purchased large quantities of Company-1 stock, which he later sold for a profit once Company-1 disclosed the positive earnings information to the public and the market reacted to the news. Conversely, when LEVOFF learned that Company-1 had posted lower-than-anticipated revenue and net profit, he sold large quantities of Company-1 stock, thus avoiding the significant losses that would occur once Company-1 disclosed the information to the public and the market reacted to the negative news regarding Company-1's earnings.

5. A number of the trades referenced in this Complaint were executed with market maker counterparties whose electronic trading systems and/or servers were located in the District of New Jersey, namely, Virtu, G1, BNY Mellon, and Two Sigma.

6. When LEVOFF executed each of the trades described in this Complaint, he was subject to a regular company-imposed "blackout period" that prohibited him and others like him with access to material nonpublic information regarding Company-1 from engaging in trades involving Company-1 stock. LEVOFF ignored this restriction, as well as Company-1's Insider Trading Policy, and instead repeatedly executed trades based on material nonpublic information without Company-1's knowledge or authorization.

### Company-1's Periodic SEC Filings, Public Disclosures of Financial Results, and the Disclosure Committee

7. At all times relevant to this Complaint, Company-1 divided its financial year into four quarters that each consisted of three calendar months: "Q1" or first quarter (October, November, December); "Q2" or second quarter (January, February, March); "Q3" or third quarter (April, May, June); and "Q4" or fourth quarter (July, August, September). As with other publicly traded companies, Company-1 was required to file quarterly Form 10-Q reports and annual Form 10-K reports with the SEC. Among other things, Company-1's periodic SEC filings contained information regarding Company-1's quarterly and yearly financial results. Once filed, Company-1's SEC filings were available online to the public.

8. Company-1 typically disclosed its quarterly and yearly financial results to the public shortly before its SEC filings. Company-1 announced its earnings via press releases and executive remarks, which occurred in or around the following dates each financial year: late-January or early-February (Q1 financial results); late-April or early-May (Q2 financial results); late-July or

early-August (Q3 financial results); and late-October or early-November (Q4 and yearly financial results).

9. At all times relevant to this Complaint, Company-1 had a Disclosure Committee that reviewed and discussed Company-1's draft SEC filings and its draft public disclosures of financial results before they were filed with the SEC and/or disclosed to the public. The composition of the Disclosure Committee changed over time, but its members typically consisted of high-level executives within Company-1, including Vice Presidents and Directors of various groups. The Disclosure Committee also included various "invitees," who were typically high-ranking employees within those groups. At any given point, the Disclosure Committee's members and invitees generally totaled approximately fourteen to approximately eighteen individuals.

10. At all times relevant to this Complaint, LEVOFF was a member and/or an invitee of the Disclosure Committee. Beginning in or around December 2012 and continuing through in or around July 2018, LEVOFF led the Disclosure Committee, serving as one of its co-chairpersons.

11. The Disclosure Committee typically met one or two weeks before Company-1 filed its Form 10-Q/Form 10-K reports with the SEC and/or disclosed its financial results to the public. The Disclosure Committee meetings took place at Company-1's headquarters in Cupertino, although some Disclosure Committee members and/or invitees participated in meetings by telephone. During the meetings, Disclosure Committee members and invitees reviewed and discussed Company-1's draft SEC filings and/or draft earnings materials that would later be disclosed to the public.

12. A few days before each Disclosure Committee meeting, Disclosure Committee members and invitees received an email or series of emails attaching Company-1's draft SEC filings and/or draft earnings materials, which included information regarding Company-1's financial results.

13. The information regarding Company-1's financial results that Disclosure Committee members and invitees received by email, and later reviewed and discussed during Disclosure Committee meetings, was material nonpublic information. The information ceased being material nonpublic information only after Company-1 disclosed the information to the public in SEC filings and/or through press releases.

14. As a Disclosure Committee member and high-ranking Company-1 employee, LEVOFF owed a fiduciary duty to Company-1 and its shareholders to protect material nonpublic information regarding Company-1 to which he had access. LEVOFF further owed Company-1 and its shareholders a duty not to use such material nonpublic information for his own personal benefit.

4

### Company-1's Insider Trading Policy and Regular Blackout Periods

15. At all times relevant to this Complaint, Company-1 prohibited its officers, directors, employees, consultants, independent contractors, and their immediate families from engaging in insider trading. Company-1 memorialized this prohibition against insider trading in its "Insider Trading Policy," which Company-1 periodically amended. Two Insider Trading Policies were in effect during the time period covered by this Complaint: an Insider Trading Policy dated August 21, 2003 (the "August 2003 Insider Trading Policy") and, later, an Insider Trading Policy dated September 2015 (the "September 2015 Insider Trading Policy").

16. Company-1's August 2003 Insider Trading Policy prohibited any officer, director, employee, consultant, independent contractor, or immediate family member who received or had access to material nonpublic information regarding Company-1 from engaging "in any transaction involving a purchase or sale of [Company-1's] securities" from the date he or she possessed material nonpublic information until either sixty hours after public disclosure of the information or at such time as the nonpublic information was no longer material. Similarly, the September 2015 Insider Trading Policy prohibited individuals from "buy[ing] or sell[ing] [Company-1] stock when aware of information that ha[d] not been publicly announced and that could have a material effect on the value of the stock" until either twenty-four hours after public disclosure or when the information was no longer material.

17. The August 2003 and September 2015 Insider Trading Policies each identified Company-1's "financial results" among the various categories of sensitive material information that could form the basis of insider trading. The August 2003 and September 2015 Insider Trading Policies also warned employees that engaging in transactions involving Company-1's stock while in possession of material nonpublic information regarding Company-1 violated federal securities laws.

18. Since at least in or around 2010, LEVOFF had responsibility for ensuring compliance with Company-1's Insider Trading Policy. In or around 2015, LEVOFF initiated and oversaw an update of the policy that resulted in the revised September 2015 Insider Trading Policy.

19. At all times relevant to this Complaint, Company-1 instituted a regular "blackout period" ahead of its public disclosure of Company-1's periodic financial results. During these blackout periods, individuals likely to possess material nonpublic information regarding Company-1 – sometimes referred to as "insiders" – were prohibited from buying or selling Company-1 securities. Company-1's blackout periods generally began on the first day of the last month of a fiscal quarter – i.e., December/Q1, March/Q2, June/Q3, and September/Q4 – and ended either sixty or twenty-four hours (depending

on the Insider Trading Policy in effect at the time) after Company-1 publicly disclosed its periodic financial results in a press release.

20. Prior to each blackout period, Company-1 sent an email to individuals subject to the blackout period notifying them (i) that they were subject to the blackout period and therefore prohibited from buying or selling Company-1 stock during that period, and (ii) of the dates the blackout period began and ended. The blackout period emails also reiterated and summarized Company-1's prohibition against insider trading.

21. At certain times relevant to this Complaint, LEVOFF's compliance responsibilities in connection with insider trading included notifying individuals subject to the blackout period or supervising individuals who made the notifications. On several occasions, LEVOFF authored and disseminated the blackout period notification emails himself. LEVOFF also played a role in determining who should be placed on the blackout list.

22. At all times relevant to this Complaint, LEVOFF – a member and/or an invitee of the Disclosure Committee with access to material nonpublic information regarding Company-1 – was subject to Company-1's blackout periods. As with other insiders, Company-1 notified LEVOFF by email that he was subject to the blackout periods and of the specific dates of the blackout periods.

23. At no time relevant to this Complaint was LEVOFF authorized by Company-1 or by any other entity to buy or sell Company-1 stock while in possession of material nonpublic information regarding Company-1, nor was he authorized to buy or sell Company-1 stock during any applicable blackout period.

### LEVOFF Trades Ahead of Company-1's Q2 2011 Earnings Announcement

24. The blackout period for Q2 2011 began on or about March 1, 2011 and ended on or about April 25, 2011 (the "Q2 2011 Blackout Period").

25. On or about February 24, 2011, LEVOFF sent an email to individuals subject to the Q2 2011 Blackout Period bearing the subject line, "Commencement of Trading Blackout – March 1, 2011." In the email, LEVOFF – who was himself subject to the Q2 2011 Blackout Period – notified the recipients that, starting on or about March 1, 2011, they and their immediate family members were prohibited from engaging in "any transactions in [Company-1] securities" until sixty hours after Company-1 announced its quarterly earnings in or around April 2011. LEVOFF stated in the email that Company-1's Insider Trading Policy prohibited individuals from buying or selling Company-1 stock if they possessed material nonpublic information

regarding Company-1. Specifically, LEVOFF wrote: "Pursuant to [Company-1's] Insider Trading Policy, you are prohibited from any transactions in [Company-1] securities if you possess or have access to material nonpublic information regarding [Company-1]." To emphasize that Company-1's prohibition against insider trading applied regardless of whether a blackout period was in place, LEVOFF wrote at the top of the email, in capitalized letters: "*** REMEMBER, TRADING IS NOT PERMITTED, WHETHER OR NOT IN AN OPEN TRADING WINDOW, IF YOU POSSESS OR HAVE ACCESS TO MATERIAL INFORMATION THAT HAS NOT BEEN DISCLOSED PUBLICLY ***." LEVOFF concluded the email by reiterating that trading on material nonpublic information was impermissible and encouraged the recipients to contact a Company-1 employee to discuss any questions they had regarding the policy.

26. On or about April 8, 2011, members and invitees of the Disclosure Committee, including LEVOFF, received an email attaching Company-1's draft Form 10-Q report for Q2 2011. The draft Form 10-Q report contained information about Company-1's earnings, including revenue and net profit for Q2 2011.

27. Several hours later, members and invitees of the Disclosure Committee, including LEVOFF, received an email attaching draft earnings materials for Q2 2011, including a draft press release, financials, and prepared executive remarks.

28. On or about April 11, 2011, the Disclosure Committee met at Company-1's headquarters in Cupertino. LEVOFF attended the meeting in person as a Disclosure Committee invitee. During the meeting, Disclosure Committee members and invitees reviewed and discussed Company-1's proposed Q2 2011 disclosures, including its draft Form 10-Q report and its draft press release regarding earnings.

29. On or about April 13, 2011, LEVOFF purchased approximately 3,140 shares of Company-1 stock in the TD Ameritrade Brokerage Account. LEVOFF purchased the Company-1 stock at an average price of approximately $334.47 per share, for a total cost of more than approximately $1 million. At the time he purchased the Company-1 stock, LEVOFF possessed material nonpublic information regarding Company-1 and was subject to the Q2 2011 Blackout Period.

30. On or about April 20, 2011, at approximately 1:30 p.m., Company-1 issued a press release disclosing its Q2 2011 financial results to the public. In the April 20, 2011 press release, Company-1 announced that it had posted record revenue and net profit for Q2 2011. Company-1's CEO remarked in the posting that Company-1 was "firing on all cylinders."

31. Later the same day, LEVOFF sold approximately 3,500 shares of Company-1 stock in the TD Ameritrade Brokerage Account while he was still subject to the Q2 2011 Blackout Period. LEVOFF sold the Company-1 shares at an average price of approximately $353.85 per share. By virtue of his sales of Company-1 stock on or about April 20, 2011, LEVOFF realized a profit of approximately $60,000.

32. On or about April 22, 2011, LEVOFF sent an email to individuals subject to the Q2 2011 Blackout Period notifying them that the blackout period would end on or about April 25, 2011. LEVOFF told the email recipients they could resume trading Company-1 securities on the specified date and reiterated Company-1's prohibition against insider trading. LEVOFF wrote in the email: "This information is provided to you in an effort to protect you and [Company-1] from any violations of federal . . . securities laws that may result from a failure to comply with those laws."

### LEVOFF Trades Ahead of Company-1's Q3 2011 Earnings Announcement

33. The blackout period for Q3 2011 began on or about June 1, 2011 and ended on or about July 22, 2011 (the "Q3 2011 Blackout Period").

34. On or about May 27, 2011, LEVOFF sent an email to individuals subject to the Q3 2011 Blackout Period with the subject line, "Commencement of Trading Blackout – June 1, 2011." LEVOFF was again among the individuals subject to the Q3 2011 Blackout Period. In the email – which, except for the dates of the applicable blackout period, was virtually identical to his February 24, 2011 email – LEVOFF notified the recipients that they and their immediate family members were prohibited from trading in Company-1 securities starting on or about June 1, 2011 until sixty hours after Company-1 announced its quarterly earnings in or around July 2011. LEVOFF stated in the email – as he had in his February 24, 2011 email – that Company-1's Insider Trading Policy prohibited individuals who possessed or had access to material nonpublic information regarding Company-1 from buying or selling Company-1 stock, regardless of whether a blackout period was in place.

35. On or about July 8, 2011, members and invitees of the Disclosure Committee, including LEVOFF, received an email attaching draft earnings materials for Q3 2011, including a draft press release, financials, and prepared executive remarks.

36. Several hours later, members and invitees of the Disclosure Committee, including LEVOFF, received an email attaching Company-1's draft Form 10-Q report for Q3 2011. The draft Form 10-Q report contained information about Company-1's earnings, including revenue and net profit for

Q3 2011. Soon after receiving this material nonpublic information, LEVOFF began purchasing Company-1 stock.

37. On or about July 11, 2011, at approximately 6:40 a.m., LEVOFF purchased approximately 850 shares of Company-1 stock in the TD Ameritrade Brokerage Account at an average price of approximately $357.76 per share. At the time he made the purchases, LEVOFF possessed material nonpublic information regarding Company-1 and was also subject to the Q3 2011 Blackout Period.

38. At approximately 8:00 a.m. the same day, LEVOFF attended a Disclosure Committee meeting at Company-1's Cupertino headquarters as an invitee. During the meeting, the Disclosure Committee members and invitees reviewed and discussed Company-1's draft Form 10-Q report and draft earnings materials for Q3 2011.

39. The following day, on or about July 12, 2011, LEVOFF purchased approximately 860 shares of Company-1 stock in the TD Ameritrade Brokerage Account.

40. On or about July 14, 2011, LEVOFF purchased approximately 600 shares of Company-1 stock in the TD Ameritrade Brokerage Account.

41. On or about July 15, 2011, LEVOFF purchased approximately 600 shares of Company-1 stock in the TD Ameritrade Brokerage Account.

42. On or about July 18, 2011, LEVOFF purchased approximately 700 shares of Company-1 stock in the TD Ameritrade Brokerage Account.

43. On or about July 19, 2011, LEVOFF purchased approximately 326 shares of Company-1 stock in the TD Ameritrade Brokerage Account.

44. Between on or about July 11, 2011 and on or about July 19, 2011, LEVOFF purchased approximately 3,936 shares of Company-1 stock at average prices ranging from approximately $354.58 to approximately $374.80 per share. LEVOFF paid nearly $1.4 million for the Company-1 stock. At the time he purchased the shares, LEVOFF was in possession of material nonpublic information regarding Company-1 and was subject to the Q3 2011 Blackout Period.

45. On or about July 19, 2011, at approximately 1:30 p.m., Company-1 issued a press release disclosing its Q3 2011 financial results to the public. The public disclosure announced that Company-1 had again posted record revenue and net profit for Q3 2011. Company-1's CEO remarked in the July 19, 2011 press release that Company-1 was "thrilled to deliver [its] best quarter ever."

46.     Later the same day, LEVOFF began selling Company-1 securities. By the time he was finished, LEVOFF had liquidated approximately 3,936 shares of Company-1 stock – the same number of shares LEVOFF had purchased in the days leading up to Company-1's July 19, 2011 press release. LEVOFF sold the 3,936 shares at an average price of approximately $397.88 per share, well above the prices he had paid for an equal number of Company-1 shares days earlier. As a result of his sales of Company-1 stock on or about July 19, 2011 – when he was still subject to the Q3 2011 Blackout Period – LEVOFF realized a profit of approximately $144,000.

47.     On or about July 21, 2011, LEVOFF sent an email notifying individuals subject to the Q3 2011 Blackout Period that the trading restriction would end on or about July 22, 2011. LEVOFF reminded the recipients that they were prohibited from trading Company-1 stock if they had access to material nonpublic information regarding Company-1 and that such conduct violated federal securities laws.

### LEVOFF Trades Ahead of Company-1's Q1 2012 Earnings Announcement

48.     The blackout period for Q1 2012 began on or about December 1, 2011 and ended on or about January 27, 2012 (the "Q1 2012 Blackout Period").

49.     On or about November 28, 2011, a Company-1 employee sent an email to individuals subject to the Q1 2012 Blackout Period, including LEVOFF. The email – which had the subject line, "Commencement of Trading Blackout – December 1, 2011" – notified the recipients that they and their immediate family members were prohibited from engaging in any transactions involving Company-1 stock beginning on or about December 1, 2011 and ending sixty hours after Company-1 announced its earnings in or around January 2012. The email stated that Company-1's Insider Trading Policy prohibited individuals who possessed or had access to material nonpublic information regarding Company-1 from buying or selling Company-1 stock, regardless of whether a blackout period was in place.

50.     On or about January 13, 2012, members and invitees of the Disclosure Committee, including LEVOFF, received an email attaching draft earnings materials for Q1 2012, including a draft press release, financials, and prepared executive remarks.

51.     Several hours later, members and invitees of the Disclosure Committee, including LEVOFF, received an email attaching Company-1's draft Form 10-Q report for Q1 2012. The draft Form 10-Q report contained information about Company-1's earnings, including revenue and net profit for Q1 2012.

52.     On or about January 16, 2012, the Disclosure Committee met at Company-1's headquarters in Cupertino. LEVOFF attended the meeting in person as a Disclosure Committee invitee. During the meeting, members and invitees of the Disclosure Committee discussed Company-1's draft Form 10-Q report and draft earnings materials for Q1 2012. After the Disclosure Committee meeting, LEVOFF began purchasing Company-1 securities, all in the TD Ameritrade Brokerage Account.

53.     On or about January 20, 2012, LEVOFF purchased approximately 800 shares of Company-1 stock at an average price of approximately $423.36 per share.

54.     On or about January 23, 2012, LEVOFF purchased approximately 250 additional shares of Company-1 stock at an average price of approximately $427.50 per share.

55.     On or about the morning of January 24, 2012, LEVOFF purchased another approximately 528 shares of Company-1 stock at an average price of approximately $423.98 per share.

56.     Together, LEVOFF paid a total of approximately $669,000 to acquire approximately 1,578 shares of Company-1 stock. At the time of the purchases, LEVOFF possessed material nonpublic information regarding Company-1 and was subject to the Q1 2012 Blackout Period.

57.     On or about January 24, 2012, at approximately 1:30 p.m., Company-1 issued a press release disclosing its Q1 2012 financial results to the public. The January 24, 2012 press release heralded Company-1's record revenue and net profit for the quarter, which Company-1's CEO credited to Company-1's "record-breaking sales" of Company-1 products.

58.     Later the same day, LEVOFF began selling shares of Company-1 stock. LEVOFF sold approximately 666 shares of Company-1 stock at an average price of approximately $454.11 per share, well above the prices LEVOFF had paid days before. By virtue of LEVOFF's sales on or about January 24, 2012 – which occurred when he was still subject to the Q1 2012 Blackout Period – LEVOFF realized a profit of approximately $19,000.

59.     On or about January 26, 2012, a Company-1 employee sent an email to individuals subject to the Q1 2012 Blackout Period, including LEVOFF, advising them that the trading restriction would end on or about January 27, 2012. The email went on to reiterate Company-1's prohibition against insider trading, regardless of whether a blackout period was in place.

### LEVOFF Trades Ahead of Company-1's Q3 2015 Earnings Announcement

60.    The blackout period for Q3 2015 began on or about June 1, 2015 and ended on or about July 24, 2015 (the "Q3 2015 Blackout Period").

61.    On or about May 26, 2015, Company-1 sent an email to individuals subject to the Q3 2015 Blackout Period, including LEVOFF. The email notified the recipients that they and their immediate family members were prohibited from buying or selling Company-1 stock beginning on or about June 1, 2015 until sixty hours after Company-1 released its earnings to the public in or around July 2015. The email stated that Company-1's Insider Trading Policy prohibited individuals who possessed or had access to material nonpublic information regarding Company-1 from buying or selling Company-1 stock, regardless of whether a blackout period was in place, and provided an email address and phone number to contact with questions.

62.    On or about July 10, 2015, members and invitees of the Disclosure Committee, including LEVOFF, received an email attaching draft earnings materials for Q3 2015, including a draft press release, financials, and prepared executive remarks.

63.    Several hours later, members and invitees of the Disclosure Committee, including LEVOFF, received an email attaching Company-1's draft Form 10-Q report for Q3 2015. The email read: "Each Disclosure Committee member is required to review the entire Form 10-Q to ensure the Company's disclosures are complete and accurate." Among other things, the attached draft Form 10-Q contained information about Company-1's earnings, including Company-1's revenue and net profit for Q3 2015.

64.    On or about July 13, 2015, the Disclosure Committee met at Company-1's headquarters in Cupertino. LEVOFF was one of the two co-chairpersons of the Disclosure Committee and participated in the meeting by telephone. During the meeting, Disclosure Committee members and invitees reviewed and discussed Company-1's draft earnings materials and draft Form 10-Q report for Q3 2015. After the Disclosure Committee meeting, LEVOFF began selling Company-1 securities.

65.    On or about July 17, 2015, LEVOFF sold approximately 43,750 shares of Company-1 stock in the TD Ameritrade Brokerage Account at an average price of approximately $129 per share. Virtu acted as a counterparty for some of these trades.

66.    That same day, LEVOFF sold approximately 8,700 shares of Company-1 stock in the First Republic Account at an average price of

approximately $128.94 per share. BNY Mellon acted as a counterparty for some of these trades.

67.   On or about July 20, 2015, LEVOFF sold approximately 7,000 more shares of Company-1 stock in the TD Ameritrade Brokerage Account at an average price of approximately $131.54 per share. G1 and Virtu each acted as counterparties for some of these trades.

68.   On or about July 21, 2015, LEVOFF sold approximately 17,678 shares of Company-1 stock in the TD Ameritrade Brokerage Account at an average price of approximately $131.07 per share. Virtu and Two Sigma each acted as counterparties for some of these trades.

69.   From on or about July 17, 2015 through on or about July 21, 2015, LEVOFF sold approximately 77,128 shares of Company-1 stock for approximately $10 million. At the time of the sales, LEVOFF was in possession of material nonpublic information regarding Company-1 and was subject to Q3 2015 Blackout Period.

70.   On or about July 21, 2015, at approximately 1:30 p.m. – after LEVOFF had sold his final shares of Company-1 stock that day – Company-1 issued a press release disclosing its Q3 2015 financial results to the public. The July 21, 2015 press release disclosed revenue and profit below what many analysts had predicted, causing Company-1's stock price to decline by nearly 4.2 percent by the close of trading the following day.

71.   As a result of LEVOFF's sale of approximately 77,128 shares of Company-1 stock ahead of Company-1's July 21, 2015 press release – when he was still subject to the Q3 2015 Blackout Period – LEVOFF avoided a loss of approximately $345,000.

72.   On or about July 23, 2015, Company-1 sent an email to individuals subject to the Q3 2015 Blackout Period, including LEVOFF, stating that the trading restriction would end the following day, on or about July 24, 2015.

### LEVOFF Trades Ahead of Company-1's Q4 2015 Earnings Announcement

73.   The blackout period for Q4 2015 began on or about September 1, 2015 and ended on or about October 29, 2015 (the "Q4 2015 Blackout Period").

74.   On or about August 27, 2015, Company-1 sent an email to individuals subject to the Q4 2015 Blackout Period, including LEVOFF, with the subject line, "Commencement of Trading Blackout – Tuesday, September 1, 2015." The email notified the recipients that they and their immediate family

members were prohibited from buying or selling Company-1 stock beginning on or about September 1, 2015 until sixty hours after Company-1 released its earnings to the public in or around October 2015. The email stated that Company-1's Insider Trading Policy prohibited individuals who possessed or had access to material nonpublic information regarding Company-1 from buying or selling Company-1 stock, regardless of whether a blackout period was in place, and provided an email address and phone number to contact with questions.

75. On or about October 12, 2015, members and invitees of the Disclosure Committee, including LEVOFF, received an email attaching Company-1's draft Form 10-K report for financial year 2015. The email stated that Disclosure Committee members were required to review "the entire Form 10-K" to ensure the disclosures it contained were complete and accurate. Among other things, the draft Form 10-K contained information about Company-1's earnings, including revenue and net profit for financial year 2015.

76. On or about October 13, 2015, members and invitees of the Disclosure Committee, including LEVOFF, received an email attaching draft earnings materials for Q4 2015, including a draft press release, financials, and prepared executive remarks.

77. On or about October 15, 2015, Disclosure Committee members and invitees met at Company-1's headquarters in Cupertino to discuss the draft Form 10-K report. LEVOFF did not attend the meeting or participate by telephone.

78. On or about October 26, 2015, LEVOFF purchased approximately 10,000 shares of Company-1 stock in the TD Ameritrade Brokerage Account at an average price of approximately $115.70 per share for a cost of approximately $1.15 million. At the time he purchased the Company-1 securities, LEVOFF possessed material nonpublic information regarding Company-1 and was subject to the Q4 2015 Blackout Period. Two Sigma acted as a counterparty for some of these trades.

79. On or about the morning of October 27, 2015, Company-1 sent an email to individuals subject to the Q4 2015 Blackout Period, including LEVOFF, informing them that they could resume trading Company-1 securities on or about October 29, 2015. (Company-1's September 2015 Insider Trading Policy reduced the waiting period from sixty hours after Company-1 disclosed earnings to twenty-four hours.) The email also reiterated Company-1's standard prohibition against trading on material nonpublic information.

80. At approximately 1:30 p.m. that afternoon, Company-1 issued a press release disclosing its Q4 2015 financial results to the public. In the

October 27, 2015 press release, Company-1 announced that Company-1 had posted record fourth quarter results, and Company-1's CEO remarked in the disclosure that "Fiscal 2015 was [Company-1's] most successful year ever."

81. On or about October 28, 2015 – before the Q4 2015 Blackout Period had terminated – LEVOFF sold approximately 12,174 shares of Company-1 stock in the TD Ameritrade Brokerage Account at an average price of approximately $116.20 per share, for a profit of approximately $4,700.

### LEVOFF Trades Ahead of Company-1's Q2 2016 Earnings Announcement

82. The blackout period for Q2 2016 began on or about March 1, 2016 and ended on or about April 28, 2016 (the "Q2 2016 Blackout Period").

83. On or about February 25, 2016, Company-1 sent an email to individuals subject to the Q2 2016 Blackout Period, including LEVOFF. The email – which had the subject line, "Commencement of Trading Blackout – Tuesday, March 1, 2016" – notified the recipients that they and their immediate family members were prohibited from engaging in any transactions involving Company-1 stock beginning on that date until twenty-four hours after Company released its earnings in or around April 2016. The email stated that Company-1's Insider Trading Policy prohibited individuals who possessed or had access to material nonpublic information regarding Company-1 from buying or selling Company-1 stock, regardless of whether a blackout period was in place, and provided an email address and phone number to contact with questions.

84. On or about April 8, 2016, members and invitees of the Disclosure Committee, including LEVOFF, received an email attaching Company-1's draft Form 10-Q report for Q2 2016. The draft Form 10-Q contained information about Company-1's earnings, including revenue and net profit for Q2 2016.

85. On or about April 15, 2016, members and invitees of the Disclosure Committee, including LEVOFF, received an email attaching draft earnings materials for Q2 2016, including a draft press release, financials, and prepared executive remarks.

86. Later the same day, the Disclosure Committee met at Company-1's headquarters in Cupertino. LEVOFF, as one of the Disclosure Committee's co-chairpersons, attended the meeting in person. During the meeting, the Disclosure Committee reviewed and discussed Company-1's draft earnings materials for Q2 2016.

87. On or about April 21, 2016, LEVOFF sold approximately 4,009 shares of Company-1 stock in the TD Ameritrade Brokerage Account at an

average price of approximately $105.87 per share. At the time, LEVOFF possessed material nonpublic information regarding Company-1 and was subject to the Q2 2016 Blackout Period. G1 acted as a counterparty for some of these trades.

88. On or about April 26, 2016, at approximately 1:30 p.m., Company-1 issued a press release disclosing its Q2 2016 financial results to the public. Company-1 announced in the April 26, 2016 press release that its revenue and net profit were each down compared to Q2 2015. Company-1's CEO remarked in the press release that Company-1's team had "executed extremely well in the face of strong macroeconomic headwinds." By the close of trading the following day, Company-1's stock price had fallen approximately 6.2 percent.

89. By virtue of his sales of Company-1 stock on or about April 21, 2016 – while he possessed material nonpublic information regarding Company-1's earnings – LEVOFF avoided a loss of approximately $32,000.

90. On or about April 27, 2016, Company-1 sent an email to individuals subject to the Q2 2016 Blackout Period, including LEVOFF. The email announced that the recipients could resume trading Company-1 securities on or about April 28, 2016.