**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,    :

    :   No. 19-cr-780-WJM

    :

    v.        :   **Document Electronically Filed**

    :

    :

GENE LEVOFF,    :   <u>**Oral Argument Requested**</u>

    :

    Defendant.    :

    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

---

MARINO, TORTORELLA & BOYLE, P.C.
437 Southern Boulevard
Chatham, New Jersey 07928-1488
(973) 824-9300
*Attorneys for Defendant*

On the Brief:
    Kevin H. Marino
    John D. Tortorella
    Wan Cha

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 4

LEGAL ARGUMENT ..................................................................................................... 5

I.    CRIMINAL INSIDER TRADING LAW IS AN UNCONSTITUTIONAL
FEDERAL COMMON-LAW CRIME. .............................................................. 6

    A.    The Criminalization Of Insider Trading Was Developed Through Case Law
Rather Than Passage Of A Statute or Regulation. ................................ 6

    B.    The Law of Insider Trading Fails Even The Constitutional Test For
Acceptable Civil Federal Common Law. ............................................... 10

II.    CRIMINAL INSIDER-TRADING LAW IS PREMISED ON AN INVALID RE-
DELEGATION OF RULEMAKING AUTHORITY FROM THE SEC TO THE
JUDICIARY. .................................................................................................... 12

    A.    In Section 10(b), Congress Expressly Directed The SEC To Identify Any
Manipulative Or Deceptive Device Or Contrivance In Connection With The
Purchase Or Sale Of Securities, But The SEC Declined To Promulgate A
Rule Or Regulation Pursuant To That Authority With Respect To Insider
Trading. .............................................................................................. 12

        1.    Section 10(b) Directed The SEC To Fill The Gap Regarding What
Constitutes A Manipulative Or Deceptive Device In The Purchase Or
Sale Of A Security. ..................................................................... 13

        2.    The Federal Common Law Of Insider Trading Manifests All Of The
Factors Indicative Of A Violation Of The Non-Delegation Doctrine ..... 15

        3.    Rule 10b-5 As Applied To Insider Trading Constitutes An
Unconstitutional Re-Delegation To The Judiciary. ......................... 16

    B.    Criminal Insider-Trading Law Is Not Entitled To *Chevron* Deference
Because The SEC Never Applied Its Expertise To Promulgate A Regulation
Proscribing It. ....................................................................................... 19

CONCLUSION ............................................................................................................. 25

## **TABLE OF AUTHORITIES**

**Cases**

Abramski v. United States,
    573 U.S. 169 (2014)............................................................................................ 23

Blue Chip Stamps v. Manor Drug Stores,
    421 U.S. 723 (1975)............................................................................................. 9

Bowen v. Massachusetts,
    487 U.S. 879 (1988)........................................................................................... 16

Cent. Bank, N.A. v. First Interstate Bank, N.A.,
    511 U.S. 164 (1994)....................................................................................... 6, 24

Chevron, U.S.A., Inc. v NRDC, Inc.,
    467 U.S. 837 (1984).................................................................................... passim

Chiarella v. United States,
    445 U.S. 222 (1980)........................................................................... 9, 11, 17, 21

Dirks v. S.E.C.,
    463 U.S. 646 (1983)............................................................................................. 3

Drake v. Thor Power Tool Co.,
    282 F. Supp. 94 (N.D. Ill. 1967) ........................................................................ 9

Erie R. R. v. Tompkins,
    304 U.S. 64 (1938)......................................................................................... 7, 10

ETSI Pipeline Project v. Missouri,
    484 U.S. 495 (1988)........................................................................................... 16

Fireman v. United States,
    20 F. Supp. 2d 229 (1998) ................................................................................... 6

Guedes v. BATFE,
    140 S. Ct. 789 (2020)......................................................................................... 22

Hampton v. Mow Sun Wong,
    426 U.S. 88 (1976).............................................................................................. 7

Jordan v. Duff & Phelps, Inc.,
    815 F.2d 429 (7th Cir. 1987) ............................................................................ 11

Kisor v. Willkie,
    139 S. Ct. 2400 (2019)....................................................................................... 20

Liparota v. United States,
    471 U.S. 419 (1985)............................................................................................. 7

Matter of Cady, Roberts & Co.,
    40 S.E.C. 907 (1961) ......................................................................................... 21

Milwaukee v. Illinois,
    451 U.S. 304 (1981)........................................................................................... 24

Mistretta v. United States,
  488 U.S. 361 (1989)........................................................................... 12, 13, 15, 16

Roth ex rel. Beacon Power Corp. v. Perseus L.L.C.,
  522 F.3d 242 (2d Cir. 2008) ............................................................................. 23

S.E.C. v. Texas Gulf Sulphur Co.,
  401 F.2d 833 (2d Cir. 1968) ....................................................................... passim

Santa Fe Indus. v. Green,
  430 U.S. 462 (1977)........................................................................................... 18

Shook v. Dist. of Columbia Fin. Responsibility & Management Assistance Authority,
  132 F.3d 775 (D.C. Cir. 1998)........................................................................... 16

Steginsky v. Xcelera Inc.,
  741 F.3d 365 (2d Cir. 2014) ...................................................................... 10, 12

Texas Indus., Inc. v. Radcliff Materials, Inc.,
  451 U.S. 630 (1981).................................................................................... 10, 11

United States Telecom Ass'n v. FCC,
  359 F.3d 554 (2004)................................................................................... 16, 17

United States v. Apel,
  571 U.S. 359 (2014)............................................................................ 20, 22, 23

United States v. Chestman,
  947 F.2d 551 (2d Cir. 1990) ................................................................ 17, 20, 24

United States v. Corbin,
  729 F. Supp. 2d 607 (S.D.N.Y. 2010) ................................................. 14, 21, 23

United States v. Hudson & Goodwin,
  11 U.S. (7 Cranch) 32 (1812) ..................................................................... 6, 24

United States v. Huet,
  665 F.3d 588 (3d Cir. 2012) ........................................................................... 4, 5

United States v. Kozminski,
  487 U.S. 931 (1988).......................................................................................... 19

United States v. Lanier,
  520 U.S. 259 (1997)............................................................................................ 7

United States v. McGee,
  763 F.3d 304 (3d Cir. 2014) ...................................................................... passim

United States v. O'Hagan,
  521 U.S. 642 (1997)...................................................................................... 3, 14

United States v. Oakland Cannabis Buyers' Coop.,
  532 U.S. 483 (2001)............................................................................................ 6

United States v. Panarella,
  277 F.3d 678 (3d Cir. 2002) .............................................................................. 6

United States v. Royer,
　549 F.3d 886 (2d Cir. 2008) .................................................................. 23

Welch v. United States,
　136 S. Ct. 1257 (2016).................................................................... 6, 24

Whitman v. United States,
　574 U.S. 1003 (2014).................................................................. 23, 24

**Statutes**

15 U.S.C. § 78d-1 .......................................................................... 17

15 U.S.C. § 78ff ............................................................................. 4

15 U.S.C. § 78j(b) ................................................................... passim

15 U.S.C. § 78n(e) .................................................................. 17, 20

15 U.S.C. § 78s(c) ......................................................................... 17

18 U.S.C. § 1343 ............................................................................ 4

18 U.S.C. § 2 ................................................................................. 4

5 U.S.C. § 551 ............................................................................... 17

**Rules**

17 C.F.R. § 240.10b-5.............................................................. passim

17 C.F.R. § 240.10b5-1................................................. 10, 17, 18

17 C.F.R. § 240.10b5-2.............................................................. passim

17 C.F.R. § 240.14e-3(a) ............................................................... 20

Fed. R. Crim. P. 12(b) ................................................................ 5, 6

**Other Authorities**

15A Moore's Federal Practice § 103.32 ......................................... 11

Hervé Gouraige, Do Federal Courts Have Constitutional Authority to Adjudicate Criminal
　Insider-Trading Cases?, 69 Rutgers L. Rev. 47 (2016) ................... passim

The Federalist No. 47 (J. Cooke ed. 1961) ..................................... 15

U.S. Const., Art. I § 1 .................................................................... 12

## PRELIMINARY STATEMENT

Federal criminal law is entirely a creature of statute.  Congress has never passed a statute outlawing insider trading.  Yet for decades, the Department of Justice, acting in concert with the Securities and Exchange Commission (the "Commission" or the "SEC"), has prosecuted insider trading as a federal crime.  The government has done so by enforcing judicial interpretations of broad SEC regulations as though they were criminal statutes passed by Congress.  They are not.  They are judge-made criminal laws.  Nothing more.  In defining criminal insider-trading law, the Judiciary has performed a decidedly legislative function—a function the Constitution grants Congress and Congress alone—in direct violation of the separation of powers doctrine that is a fundament of our system of government.  This blatant violation of that animating principle of American law has become an accepted practice.  Legions of criminal insider-trading cases have been prosecuted around the country, resulting in myriad insider-trading convictions, although Congress has never criminalized trading securities on the basis of material non-public information.

On this motion, defendant Gene Levoff ( "Levoff") asks this Court to refuse to sanction that unlawful prosecutorial practice.  He challenges the United States Attorney to identify the federal criminal law—a law passed by Congress—that he violated when he allegedly traded Apple stock based on information he gleaned as an in-house Apple lawyer and senior executive.

No such law exists.  The Indictment is based instead on unconstitutional federal common law, which developed in three stages.  *First*, through Section 10(b) of the Exchange Act of 1934 ("Section 10(b)")—which does not criminalize any conduct, much less proscribe insider trading—Congress delegated to the SEC the power to pass regulations prohibiting "manipulative or deceptive device[s]" "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b).  Had the SEC performed that legislative function properly delegated to it by Congress—by using its institutional expertise to promulgate regulations that targeted insider trading as a specific

manipulative practice or deceptive device—those regulations would have the force of criminal law.  But the SEC did not do so.  Instead, it adopted Rule 10b-5 ("Rule 10b-5"), a catch-all rule that merely tracks the language of Section 10(b), the enabling statute passed by Congress.  Rule 10b-5, like the statute it was supposed to clarify, broadly prohibits "any device, scheme or artifice to defraud" and "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any business, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(a), (c).

*Second*, in adopting a rule that did not identify the specific fraudulent conduct Section 10(b) proscribes, thereby failing to fulfill the legislative function delegated it by Congress, the SEC created a scenario in which the Executive could prosecute insider trading as a federal crime with no statutory basis for doing so.  By seizing the opportunity to prosecute insider trading under the broad catch-all Rule 10b-5 in the absence of any statutory definition of that offense, the Executive effectively re-delegated to the Judiciary the rulemaking responsibility, accountability, and power to create law that Congress had delegated to the SEC.  The result:  the flagrantly unconstitutional federal common-law crime of insider trading, masquerading as a criminal law passed by Congress.

*Third*, when defendants victimized by the Judiciary's interpretation of the SEC's broad Rule 10b-5 as stating a federal crime, the government invoked "Chevron deference," relying on the Supreme Court's holding in Chevron, U.S.A., Inc. v NRDC, Inc., 467 U.S. 837, 842 (1984), that courts must defer to agency interpretations of statutes.  Arguing that Rule 10b-5 fell within the scope of Section 10(b), the government urged that the *stare decisis* effect of prior insider-trading decisions should preclude courts from restricting the SEC's insider-trading enforcement authority.  The courts responded by extending Rule 10b-5's reach to the conduct of various actors,

2

from classical insiders to tippees to misappropriators.  See S.E.C. v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968) (classical insiders); Dirks v. S.E.C., 463 U.S. 646 (1983) (tippees); United States v. O'Hagan, 521 U.S. 642 (1997) (misappropriators). As a result, the government now exercises the broadest possible enforcement authority over insider trading, although the SEC never employed the authority delegated it by Congress to promulgate a rule proscribing that conduct—confirming that the criminal law under which so many have been convicted is entirely judge-made. But Chevron deference has no place in the context of insider trading because the SEC never exercised its expertise to pass a regulation to which courts could properly defer.  Moreover, recent Supreme Court jurisprudence makes clear that Chevron deference does not apply to agency interpretations of criminal statutes.  Meaning that courts must not defer to agency expertise when interpreting criminal laws.

The federal courts' expansive treatment of Section 10(b) and Rule 10b-5 to define insider trading does not reflect permissible statutory or regulatory interpretation, but rather the unconstitutional transfer of legislative authority to the Judiciary.  The non-delegation doctrine prohibits the SEC from re-delegating rulemaking authority to the Judiciary, but it did so anyway.  By steadfastly refusing to apply its expertise to define insider trading, the SEC willingly ceded to the Judiciary the power to create and develop the crime of insider trading.  Nothing in the Constitution, the case law, or any statute gave the SEC the power to delegate that authority, the courts the right to deploy it, or U.S. attorneys the right to enforce the resulting judge-made law.

For the reasons outlined above and amplified below, the Indictment fails to state a crime and should be dismissed.[1]

---

[1] Because the wire fraud charges against Levoff are based entirely on the insider-trading allegations, dismissal of the securities fraud charges against Levoff also requires dismissal of the

## STATEMENT OF FACTS[2]

Counts One through Six of the Indictment charge Levoff with securities fraud (15 U.S.C. §§ 78j(b), 78ff; 18 U.S.C. § 2; 17 C.F.R. §§ 240.10b-5, 240.10b5-2) and Counts Seven through Twelve charge him with wire fraud (18 U.S.C. §§ 1343 and 2), all arising from an alleged insider-trading scheme.

The Indictment charges that from approximately 2008 to 2013, Levoff was the Director of Corporate Law of a publicly-traded company the Government has acknowledged is Apple Inc. ("Apple" or the "Company"). (Indictment ¶ 1(b).) From 2013 to 2018, Levoff was Apple's Senior Director of Corporate Law and "functioned as [its] top corporate attorney." (Id.) At various times during his tenure at Apple, Levoff also served as the Company's Assistant Secretary and its Corporate Secretary. (Id.) In addition, from approximately September 2008 through July 2018, Levoff served on Apple's Disclosure Committee and, from approximately December 2012 through July 2018, was one of the co-chairs of that Committee. (Indictment ¶ 1(d).) Levoff's membership on the Disclosure Committee allowed him access to Apple's draft SEC filings and earnings materials before the Company disclosed its quarterly and yearly financial results to the public. (Id.)

As part of his responsibilities at Apple, Levoff oversaw the Company's "compliance with securities laws, which included advising others regarding [SEC] filings and financial reporting." (Indictment ¶ 1(b).) In addition, Levoff was responsible for "ensuring compliance with [the Company's] Insider Trading Policy[, which] prohibited the unauthorized disclosure of any

---

wire fraud charges. Here, the "scheme and artifice to defraud" required under 18 U.S.C. § 1343 consists of nothing more than the alleged insider-trading scheme.

[2] The background facts are derived from the Indictment and are accepted as true solely for purposes of this motion. United States v. Huet, 665 F.3d 588, 595–96 (3d Cir. 2012).

nonpublic information acquired in the workplace and the misuse of material nonpublic information in securities trading."  (Indictment ¶ 1(c).)

Between approximately April 2011 and April 2016, Levoff engaged in multiple transactions in Apple stock that were allegedly based on material nonpublic information he obtained through his position on the Company's Disclosure Committee.  (Indictment ¶ 4(a)–(b).) According to the Indictment, if Apple had "strong revenue and net profit for a given financial quarter," Levoff purchased stock in the Company and later sold that stock at a profit after the Company disclosed the positive earnings information to the public.  (Indictment ¶ 4(b).)  If the Company had disappointing revenue and profits, Levoff sold Apple stock and avoided losses he otherwise would have sustained after the Company made the earnings information public. (Id.)

All charges in the Indictment arise from this purported insider-trading scheme.  Because insider trading does not violate any criminal law passed by the United States Congress, this motion to dismiss follows.

## **LEGAL ARGUMENT**

Levoff moves to dismiss the Indictment because (i) it fails to state an offense; (ii) it unconstitutionally applies Section 10(b), the rules promulgated thereunder, and federal common law to insider trading; and (iii) the Court lacks subject-matter jurisdiction to adjudicate a federal common-law crime.  Fed. R. Crim. P. 12(b).

An indictment, if valid on its face, is ordinarily not subject to challenge.  Huet, 665 F.3d at 594–95.  On a Rule 12(b) motion to dismiss an indictment, the ultimate inquiry is whether, assuming all of the facts alleged in the indictment are true, "a jury could find that the defendant committed the offense for which he was charged."  Id. at 595–96.  "[A] charging document fails to state an offense if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation."  United States v. Panarella,

277 F.3d 678, 685 (3d Cir. 2002).  An indictment also fails to state an offense if the underlying statute or regulation is unconstitutional.  Fireman v. United States, 20 F. Supp. 2d 229, 231 (D. Mass. 1998).  And as a matter of first principles, the Court lacks jurisdiction under Rule 12(b)(2) to adjudicate federal common-law crimes.  See United States v. Hudson & Goodwin, 11 U.S. (7 Cranch) 32, 33–34 (1812).

## I.  CRIMINAL INSIDER TRADING LAW IS AN UNCONSTITUTIONAL FEDERAL COMMON-LAW CRIME.

### A. The Criminalization Of Insider Trading Was Developed Through Case Law Rather Than Passage Of A Statute or Regulation.

The definition of insider trading is wholly judge made:  Every element of the crime and the scope of regulated individuals subject to it was divined by judges, not elected legislators.  This alone renders the criminal prosecution of insider trading unconstitutional.  As the United States Supreme Court has repeatedly declared, "all exercise of criminal jurisdiction in common law cases . . . is not within [the Court's] implied powers."  Hudson, 11 U.S. at 33–34; Cent. Bank, N.A. v. First Interstate Bank, N.A., 511 U.S. 164, 181 (1994), superseded by statute on other grounds ("There is no federal common law of crimes."); Welch v. United States, 136 S. Ct. 1257, 1268 (2016) ("[O]nly Congress, and not the courts . . . can make conduct criminal.") (internal citation omitted); United States v. Oakland Cannabis Buyers' Coop., 532 U.S. 483, 490 (2001) ("[U]nder our constitutional system . . . federal crimes are defined by statute rather than by common law.") (citing Hudson, 11 U.S. at 34); see generally Hervé Gouraige, Do Federal Courts Have Constitutional Authority to Adjudicate Criminal Insider-Trading Cases?, 69 Rutgers L. Rev. 47, 52–60 (2016) (explaining that insider trading is a common law crime and detailing the origin and development of the prohibition against federal common-law crimes).

While civil federal common law has been permitted under certain narrow exceptions, criminal federal common law is always unconstitutional.  See Hudson, 11 U.S. at 33–34; see also

Erie R. R. v. Tompkins, 304 U.S. 64, 78 (1938) ("[T]here is no federal general common law. . . . And no clause in the Constitution purports to confer such a power upon the federal courts."). The Supreme Court's consistent rejection of federal common law reflects the threat it would pose to the Constitution's democratic structure and the separation of powers between the co-equal branches of government. As the Court has explained, "[t]he definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." Liparota v. United States, 471 U.S. 419, 424 (1985); see also United States v. Lanier, 520 U.S. 259, 267 n.6 (1997) ("Federal crimes are defined by Congress, not the courts."). Criminal insider-trading law runs afoul of that bedrock principle.

The SEC's first regulation addressing fraud in connection with the purchase or sale of securities was Rule 10b-5. Although, in passing Section 10(b), Congress expressly delegated to the SEC the power to use its institutional expertise to adopt regulations that identified the types of fraudulent conduct that ran afoul of that statute, see Hampton v. Mow Sun Wong, 426 U.S. 88, 115 (1976) (stating that "administrative agencies [have] an obligation to perform [their] responsibilities with some degree of expertise"), the SEC failed to do so. Instead, Rule 10b-5 merely parrots the language of Section 10b.

> Section 10(b) states:
>
> It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement[,] any manipulative or deceptive device or contrivance *in contravention of such rules and regulations as the Commission may prescribe* as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (emphasis supplied).

Rule 10b-5 states:

It shall be unlawful for any person directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Section 10(b) expressly defines the conduct it proscribes as that which contravenes "such rules and regulations as the Commission may prescribe." But Rule 10b-5—the regulation at the very heart of the Indictment against Levoff and every other insider trading defendant—does not mention, much less define, insider trading. Despite Congress's statutory direction that the SEC define "manipulative or deceptive device[s]" "in connection with the purchase or sale of any security," 15 U.S.C. § 78j(b), Rule 10b-5 simply restates Section 10(b), broadly prohibiting "any device, scheme or artifice to defraud," and "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any business, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(a), (c).

When the SEC brought the earliest insider-trading cases, more than twenty years after it promulgated Rule 10b-5, it relied upon the courts to supply a federal common-law definition of insider trading. The SEC used civil rather than criminal cases to facilitate this early expansion of the common law. See Texas Gulf Sulphur Co., 401 F.2d at 854–55 (a seminal insider trading decision establishing the "disclose or abstain" rule in a civil proceeding). By subsequently

8

prosecuting insider trading under Rule 10b-5, the Department of Justice, in coordination with the SEC, encouraged the Judiciary to define the crime of insider trading on a case-by-case basis in lieu of the clear and universally applicable regulatory definition Congress envisioned when it outlawed any conduct that contravened "such rules and regulations as the Commission may prescribe." Section 10(b).  That unconstitutional maneuver circumvented the democratic legislative process and disregarded the fundamental guarantee of due process, thereby enabling the SEC and the government to retain maximum prosecutorial flexibility.

Beginning with the very first insider trading cases, courts have routinely acknowledged the common-law nature of that offense.  In Texas Gulf Sulphur Co., the Second Circuit explained: "Absent any clear indication of a legislative intention [as to whether insider trading requires a particular element,] . . . the securities laws should be interpreted as an expansion of the *common law* both to effectuate the broad remedial design of Congress, . . . and to ensure uniformity of enforcement."  401 F.2d at 854–55 (emphasis added).

In Chiarella v. United States, 445 U.S. 222 (1980), the Supreme Court acknowledged that "administrative and judicial interpretations," and not any regulatory or statutory text, "established that silence in connection with the purchase or sale of securities may operate as a fraud actionable under § 10(b)."  Id. at 231.  Accordingly, the Supreme Court accurately described Rule 10b-5 as "a judicial oak which has grown from little more than a legislative acorn."  Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 737 (1975); see also Drake v. Thor Power Tool Co., 282 F. Supp. 94, 97 (N.D. Ill. 1967) ("The courts have used Rule 10b-5 to expand the range of liability in the realm of securities transactions, thereby creating a Federal common law which is in a state of flux.").  Despite numerous opportunities to examine the constitutionality of a federal common law of insider trading, courts have refused to do so.  See Gouraige, 69 Rutgers L. Rev., at 51–53

(describing and collecting sources regarding courts' missed opportunities).

In 2000, the SEC itself acknowledged that insider trading is defined by common law when it passed SEC Rules 10b5-1 ("Rule 10b5-1") and 10b5-2 ("Rule 10b5-2"), stating:  "The law of insider trading is otherwise defined by judicial opinions construing Rule10b-5, and [Rule 10b5-1 and Rule 10b5-2 do] not modify the scope of insider trading law in any other respect."  17 C.F.R. §§ 240.10b5-1 & 240.10b5-2.  Removing any remaining doubt, in 2014 the Second Circuit stated expressly that "the fiduciary-like duty against insider trading under Section 10(b) is imposed and defined by federal common law."  Steginsky v. Xcelera Inc., 741 F.3d 365, 370 (2d Cir. 2014).

Accordingly, although it has not been effectively challenged on that basis, the use of Section 10(b) and Rule 10b-5 to proscribe insider trading undeniably constitutes federal criminal common law.  See Gouraige, 69 Rutgers L. Rev. at 60–70 (detailing historical common law development of insider-trading law).

### B. The Law of Insider Trading Fails Even The Constitutional Test For Acceptable Civil Federal Common Law.

Even in the civil context, federal common law may only be created in two narrow circumstances:  (i) when necessary to protect uniquely federal interests; and (ii) where a distinctive policy of an Act of Congress requires federal common law principles to effectuate the statutory intent.  Texas Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 640 (1981); see also Erie, 304 U.S. at 78 (stating that, as a general rule, even in the civil context "[t]here is no federal general common law. . . . And no clause in the Constitution purports to confer such a power upon the federal courts.").  The law of insider trading fails even this two-part test for permissible civil common law.

First, insider-trading law does not fit within the narrow categories of common law "necessary to protect federal interests," which courts have traditionally limited to rights and

obligations of the United States, international disputes, admiralty cases, and otherwise unique circumstances unrelated to insider trading. *See* 15A Moore's Federal Practice § 103.32 (collecting cases). *Second*, Congress plainly did not believe federal common law was necessary to effectuate its intent under Section 10(b); it expressly directed the SEC, not the courts, to develop rules and regulations clarifying the conduct that statute proscribes. See also Texas Indus., Inc., 451 U.S. at 640 (requiring Congress's intent for federal common law to be "clear"). And to the extent federal common law became "necessary" to protect a federal interest in prohibiting insider-trading law, that necessity only arose from the SEC's refusal to utilize its expertise and follow Congress's express direction that it pass rules and regulations defining securities fraud, much less pass one that defined insider trading. In other words, any supposed "necessity" for the courts to define the conduct that violates Section 10(b) was created by the SEC's failure to define that conduct, as Congress envisioned. There is no necessity in the insider trading context sufficient to justify the creation of federal civil common law.

When one traces the development of insider-trading law, its status as an unconstitutional federal common law crime comes clearly into focus. *First*, all of the cases that established insider-trading law were civil, not criminal, cases. See, e.g., Texas Gulf Sulphur Co., 401 F.2d at 854–55 (civil case); see also Chiarella, 445 U.S. at 238 (Stevens, J., concurring) (clarifying that "[t]he Court correctly does not address . . . whether the petitioner's breach of his duty of silence . . . could give rise to criminal liability under Rule 10b-5").

*Second*, the duty element of insider trading was drawn from state common law. See, e.g., Jordan v. Duff & Phelps, Inc., 815 F.2d 429, 435–36 (7th Cir. 1987) (stating that, in the context of Section 10(b), "[t]he obligation to break silence is itself based on state law"). More recently, courts have acknowledged that the duty analysis in insider-trading cases constitutes federal common law.

See Steginsky, 741 F.3d at 371 ("[W]e hold that the fiduciary-like duty against insider trading under Section 10(b) is imposed and defined by federal common law . . . . [I]nsider trading cases from this Court and the Supreme Court have implicitly assumed that the relevant duty springs from federal law.").

*Third*, any asserted benefit from having a uniform federal common law of insider trading is vitiated by the fact that insider-trading law is entirely unpredictable. The use of a catch-all regulation in Rule 10b-5 and the constant expansion of the definition of insider trading through case-by-case prosecution have ensured that unpredictability. An amorphous definition of insider trading that merely facilitates the ad hoc criminalization of conduct fails to serve any significant interest in nationwide uniformity. See Gouraige, 69 Rutgers L. Rev. at 112–15 (providing examples of the confusion and unpredictability within insider trading case law); see also id. at 126 ("The current state of federal insider-trading criminal law is in some areas both confused and confusing.").

These three points demonstrate that there is no basis for a federal civil common law of insider trading, much less a facially unconstitutional criminal common law.

## II. CRIMINAL INSIDER-TRADING LAW IS PREMISED ON AN INVALID RE-DELEGATION OF RULEMAKING AUTHORITY FROM THE SEC TO THE JUDICIARY.

### A. In Section 10(b), Congress Expressly Directed The SEC To Identify Any Manipulative Or Deceptive Device Or Contrivance In Connection With The Purchase Or Sale Of Securities, But The SEC Declined To Promulgate A Rule Or Regulation Pursuant To That Authority With Respect To Insider Trading.

"Congress generally cannot delegate its legislative power to another Branch." Mistretta v. United States, 488 U.S. 361, 372 (1989) ("The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government."); see also U.S. Const., Art. I § 1 ("All legislative powers herein granted shall be vested in a Congress of the United States

. . . .").  With the expansion of administrative agencies, however, courts have permitted Congress to delegate rulemaking powers to agencies, provided the relevant enabling statute contains "an intelligible principle to which . . . [an agency] is directed to conform."  Mistretta, 488 U.S. at 372. Many litigants have challenged insider-trading charges on the grounds that Section 10(b) fails to supply such an intelligible principle.  Courts generally reject such challenges, relying on the fact that Congress expressly delegated to the SEC the power to supply that principle.  But those courts have overlooked the fact that despite that delegation, the SEC did not apply its agency expertise to criminalize insider trading; Rule 10(b)(5) merely parrots the language of Section 10(b).  The Judiciary has filled the gap Congress acknowledged existed in that statutory section, in direct violation of the Constitution.

> **1.** ***Section 10(b) Directed The SEC To Fill The Gap Regarding What Constitutes A Manipulative Or Deceptive Device In The Purchase Or Sale Of A Security.***

In the insider-trading context, defendants have raised the non-delegation doctrine to argue that the government and the SEC's coordinated prosecution of insider trading went beyond the scope of Congress's delegation to the Commission—i.e., that Section 10(b) contained no "intelligible principle" with respect to insider trading.  Courts have routinely treated such non-delegation doctrine arguments as raising a question of statutory construction and have invoked Chevron deference to reject them.  Chevron, 467 U.S. at 843 (holding that "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute").  As a result, courts have never tackled the fatal separation of powers problem inherent in the SEC's re-delegation of legislative power to the Judiciary.

This problem is amply illustrated by decisions of the Southern District of New York and

the Third Circuit upholding Rule 10b5-2 (a sister regulation to Rule 10b-5) based on the Supreme Court's decision in United States v. O'Hagan, 521 U.S. 642 (1997). O'Hagan adopted the misappropriation theory of insider trading, which expanded that offense to include trading on information "in breach of a duty of trust and confidence" owed "the source of the information." Id. at 651–54 (1997). In United States v. Corbin, 729 F. Supp. 2d 607 (S.D.N.Y. 2010), the court invoked Chevron deference to uphold Rule 10b5-2, finding that rule was a "reasonable policy choice" as required by the Chevron standard because the rule "derived from O'Hagan," a judicial opinion. Id. at 617–18. More recently, in United States v. McGee, 763 F.3d 304 (3d Cir. 2014), the Third Circuit invoked Chevron deference to conclude that Rule 10b5-2 did not exceed Congress's delegation to the SEC. 763 F.3d at 313. In McGee, the court found that Section 10(b) "is ambiguous because Congress declined to define the amorphous term 'deceptive device,'" and because it "does not mention insider trading at all, much less misappropriation or relationships required for liability." Id. The court continued, "[t]his congressional omission constitutes a delegation of authority to the SEC to 'fill the statutory gap in reasonable fashion.'" Id. (internal citation omitted). Although the court went on to affirm the defendant's insider-trading conviction based on the misappropriation theory of insider trading, that is a judge-made theory nowhere to be found in Section 10(b) or Rule 10b-5. See id. at 313–14.

While paying lip service to Chevron deference—deference to the work of administrative agencies—courts have permitted insider-trading cases to proceed based on judicially created definitions of that offense. Because the statutory gap in Section 10(b), at least as it relates to insider trading, has been filled by judicial opinions rather than agency expertise, the SEC has engaged in an unconstitutional re-delegation of its rulemaking authority to the Judiciary. Judge-made rules born of that re-delegation are no substitute for federal criminal statutes passed by

Congress.  Lost in the piecemeal development of insider-trading law is the bedrock premise that federal crimes are entirely a creature of statute.

### 2.    *The Federal Common Law Of Insider Trading Manifests All Of The Factors Indicative Of A Violation Of The Non-Delegation Doctrine.*

While Congress enjoys broad authority to delegate rulemaking powers to agencies, the Supreme Court has indicated that the non-delegation doctrine is violated when certain factors are present:  (i) "the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department," Mistretta, 488 U.S. at 381 (emphasis in original) (quoting The Federalist No. 47, at 325–26 (J. Cooke ed. 1961)); (ii) "Congress has vested in [one Branch] powers that are more appropriately performed by the other Branches or that undermine the integrity of [another Branch]," id. at 385; and (iii) Congress delegates the authority to substantially "bind or regulate the primary conduct of the public," id. at 396.  The common law of insider trading violates all three of these factors, demonstrating that the constitutional problem cuts even deeper than the general prohibition against federal common-law crimes.

*First*, the federal common law of insider trading is entirely a judicial creation.  The SEC's catch-all Rule 10b-5 does not reflect the application of any administrative expertise.  Indeed, it says nothing whatsoever of substance.  Consequently, the Judiciary has been solely responsible for defining insider trading.  Not only has the Judiciary thus exercised the lawmaking power of Congress; it has also exercised the rulemaking power Congress delegated to the SEC.

*Second*, through the SEC's unconstitutional re-delegation to the Judiciary of the power to define insider trading, the Judiciary has exercised powers that are plainly legislative.  See Gouraige, 69 Rutgers L. Rev. at 126 ("[I]n this area of law, the task is plainly a legislative one . . . .").  Further, the integrity of the rulemaking system by which agencies utilize significant resources and expertise to develop industry-specific regulations is undermined by the SEC's

decision not to develop its own definition of insider trading.  By failing to utilize its delegated

rulemaking authority to define the types of fraudulent conduct proscribed by Section 10(b), instead

leaving that task for judges to perform on a case-by-case basis, the SEC invalidated the legislative

power bestowed on it by Congress.  See Bowen v. Massachusetts, 487 U.S. 879, 908 n.46 (1988)

(noting that "[t]he power [of administrative agencies] is legitimized by the technical expertise of

[the] agencies" (internal citation omitted)).

*Third*, although Section 10(b) and Rule 10b-5 do not mention insider trading and the cases

interpreting them confirm that insider trading is entirely a common-law creation, the judge-made

definitions of insider trading carry the broadly-applicable scope and weight of legislation.  In other

words, the judge-made law of insider trading directly "regulate[s] the primary conduct of the

public."  Mistretta, 488 U.S. at 396.  The Constitution does not allow judicial legislation, and

Congress could not have intended it.

### 3. *Rule 10b-5 As Applied To Insider Trading Constitutes An Unconstitutional Re-Delegation To The Judiciary.*

One fundamental corollary of the non-delegation doctrine is that an agency with delegated

authority from Congress cannot re-delegate that authority to the Judiciary.  The Supreme Court

has stated that a delegated branch of government "is not permitted to administer [an] Act [of

Congress] in a manner that is inconsistent with the administrative structure that Congress enacted

into law." ETSI Pipeline Project v. Missouri, 484 U.S. 495, 517 (1988).  Embracing that principle,

the D.C. Circuit refused to allow the Control Board to "redelegate its [statutory] power to an

outside body" in Shook v. Dist. of Columbia Fin. Responsibility & Management Assistance

Authority, 132 F.3d 775, 783–84 (D.C. Cir. 1998).  As that court—the nation's preeminent forum

for resolving questions of administrative law—explained in United States Telecom Ass'n v. FCC,

359 F.3d 554 (D.C. Cir. 2004):

> [T]he cases recognize an important distinction between subdelegation to a *subordinate* and subdelegation to an *outside party*.  The presumption that subdelegations are valid absent a showing of contrary congressional intent applies only to the former. . . . Indeed, if anything, the case law strongly suggests that subdelegations to outside parties are assumed to be improper absent an affirmative showing of congressional authorization.

Id. at 565 (emphasis in original).

With respect to the SEC, Congress passed 15 U.S.C. § 78d-1(a), which states:

> [T]he Securities and Exchange Commission shall have the authority to delegate, by published order or rule, any of its functions to a division of the Commission, an individual Commissioner, an administrative law judge, or an employee or employee board, including functions with respect to hearing, determining, ordering, certifying, reporting, or otherwise acting as to any work, business, or matter. *Nothing in this section shall be deemed* to supersede the provisions of section 556(b) of title 5, or *to authorize the delegation of the function of rulemaking* as defined in subchapter II of chapter 5 of title 5, United States Code [5 USCS §§ 551 et seq.], with reference to general rules as distinguished from rules of particular applicability, or of the making of any rule pursuant to section 19(c) of this title [15 USCS § 78s(c)].

(Emphasis added.)

Yet instead of utilizing its expertise and passing regulations to define insider trading and other species of securities fraud, the SEC passed a catch-all regulation that merely parrots the language it was tasked with defining.  See United States v. Chestman, 947 F.2d 551, 564 (2d Cir. 1990) ("Unlike Rule 10b-5, Rule 14e-3(a) is not a general catchall provision."); id. at 560 ("Section 10(b) is a general antifraud statute, while section 14(e)  is an antifraud provision specifically tailored to the field of tender offers . . . ."); see also Chiarella, 445 U.S. at 234–35 (describing Section 10(b) itself, which Rule 10(b)(5) mirrors, "as a catchall provision").  By refusing to define insider trading, then coordinating with the government to prosecute insider trading cases under Rule 10b-5, the SEC effectively and unconstitutionally re-delegated the responsibility and power to define insider trading to the Judiciary.  Moreover, in 2000, when the Commission promulgated Rules 10b5-1 and 10b5-2, the SEC explicitly confirmed its re-delegation of the definition of insider

17

trading to the Judiciary, stating:  "The law of insider trading is otherwise defined by judicial opinions construing Rule10b-5, and [Rule 10b5-1 and Rule 10b5-2 do] not modify the scope of insider trading law in any other respect."  17 C.F.R. §§ 240.10b5-1 & 240.10b5-2.

Unlike Congress's well-established delegation authority, the SEC's failure to define criminal insider trading and its effective re-delegation of its rulemaking responsibility to the Judiciary is not supported by any case law, statute, or the Constitution.  See Santa Fe Indus. v. Green, 430 U.S. 462, 472 (1977) ("The rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law.  Rather, it is 'the power to adopt regulations to carry into effect the will of Congress as express by the statute.'" (internal citation omitted)).  Accordingly, by re-delegating to the Judiciary its authority to define insider trading, the SEC impermissibly exceeded the power granted it by Congress under Section 10(b).  See id. ("[The scope of the Rule] cannot exceed the power granted the Commission by Congress under § 10(b).") (alteration in original).

Here, the result is a subversion of the gap-filling, legislative role the SEC was intended to fulfill for Congress, and a radical recasting of the interpretive role the Constitution grants the Judiciary.  The SEC did not use the power delegated it by Congress to define a clear law that puts citizens on notice of what constitutes illegal insider trading, and did not leave to the courts the proper judicial function of interpreting that law.  As a result, the federal Judiciary was left to perform the uniquely legislative function of defining the crime of insider trading.  That is a clear departure from the process intended by the Constitution.  See, e.g., McGee, 763 F.3d at 313 ("[I]t is for agencies, not courts, to fill statutory gaps." (internal citation omitted)).  The entire constitutional structure of checks, balances, and appropriate roles has been turned on its head.

In practice, the Department of Justice and the SEC have maximized their collective

authority, discretion, and flexibility to criminalize and prosecute conduct they deem undesirable. Through gradual cumulative steps designed to avoid self-restricting measures at the cost of clarity and due process, the SEC and the government have developed a powerful and unchecked system for criminalizing and prosecuting insider trading on a case-by-case basis without ever defining the proscribed conduct.  This directly undermines the Constitution's checks and balances for criminal prosecutions, as the Supreme Court explained in United States v. Kozminski:

> It is one thing to recognize that some degree of uncertainty exists whenever judges and juries are called upon to apply substantive standards established by Congress; it would be quite another thing to tolerate the arbitrariness and unfairness of a legal system in which the judges would develop standards for imposing criminal punishment on a case-by-case basis.

487 U.S. 931, 951 (1988), superseded by statute on other grounds.  Even worse, the typical justifications for broad agency powers—i.e., administrative expertise and resources for developing regulations tailored to complex industries—are wholly absent in light of the SEC's decision to forgo developing a regulation that defines insider trading.

Thus, rather than a balance of powers between branches of government, insider trading is governed by siloed branches in which none of the branches can be held accountable—Congress and the SEC never defined insider trading and the power to define insider trading is concentrated in the Judiciary, which is insulated from the democratic process by lifetime appointments under Article III.

**B. Criminal Insider-Trading Law Is Not Entitled To Chevron Deference Because The SEC Never Applied Its Expertise To Promulgate A Regulation Proscribing It.**

The Supreme Court's relatively recent rejection of Chevron deference for criminal statutes significantly narrows the scope of binding precedent in analyzing the constitutional issues

19

presented here.[3]  United States v. Apel, 571 U.S. 359, 369 (2014).  Many insider-trading cases have relied on the judge-made determination that Section 10(b) and Rule 10b-5 govern insider trading, granting express or implied deference to the SEC's self-serving interpretations of those provisions.  Accordingly, the precedential weight of many historical insider-trading cases is diminished and a much stricter construction is necessary.

Cases that have focused on the text of Section 10(b) rather than the common law that developed in its wake have consistently found that Section 10(b) does not encompass insider trading by any fair reading.  See, e.g., Chestman, 947 F.2d at 561–62 ("Neither the language of Rule 10b-5, SEC discussions of the rule, nor administrative interpretations of the rule offered any evidence that the SEC, in drafting Rule 10b-5, intended the rule to go beyond common law fraud. . . . The language of Rule 14e-3(a), on the other hand, reveals express SEC intent to proscribe conduct not covered by common law fraud."  (internal citation omitted));[4] id. ("'By comparison,

---

[3] Similarly, the Supreme Court's recent decision in Kisor v. Willkie, 139 S. Ct. 2400 (2019), substantially limited the application of Auer deference—i.e., deference to an agency's interpretation of its own regulation.  In Kisor, the Court held that Auer deference is only available to an agency if:  (i) the regulatory interpretation is one "actually made by the agency"; (ii) "the agency's interpretation . . . in some way implicate[s] its substantive expertise"; and (iii) the agency's "reading of a rule . . . reflect[s] 'fair and considered judgment,'" and "courts should decline to defer to a merely 'convenient litigating position' or 'post hoc rationalizatio[n] advanced' to 'defend  past agency action against attack.'"  Id. at 2416–18 (internal citations omitted) (last alteration in original).  With respect to Rule 10b-5, all the modern interpretations of the regulation are judge-made and, therefore, the SEC never utilized its expertise when defining insider trading. At best, the SEC's original formulations of Rule 10b-5 were submitted to courts as convenient litigation positions.  In light of this new precedent, courts no longer need defer to the SEC's interpretation of Rule 10b-5 as encompassing insider trading.

[4] Section 14(e) of the Securities Exchange Act of 1934 is codified at 15 U.S.C. § 78n(e) and states:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

the Commission's rulemaking authority under 10(b) does not include the power to define manipulative or deceptive' acts or to adopt prophylactic measures." (internal citation omitted)); Chiarella, 445 U.S. at 226 ("Although the starting point of our inquiry is the language of the statute, . . . § 10(b) does not state whether silence may constitute a manipulative or deceptive device. . . . When Rule 10b-5 was promulgated in 1942, the SEC did not discuss the possibility that failure to provide information might run afoul of § 10(b).").

By first developing insider-trading common law in civil cases, the SEC was able to use its internal administrative precedent in Matter of Cady, Roberts & Co., 40 S.E.C. 907 (1961), to facilitate the court's adoption of the original "disclose or abstain rule" in Texas Gulf Sulphur Co., 401 F.2d at 848.  Having developed common-law precedent that Rule 10b-5 and Section 10(b) sanctioned insider-trading violations as defined by the Judiciary, federal prosecutors in concert with the SEC used *stare decisis* to bind courts to accept similar and gradually more expansive definitions of insider trading in criminal cases.  As courts afforded administrative agencies increasing deference culminating in the Supreme Court's decision in Chevron, 467 U.S. at 842, that deferential standard compounded the Judiciary's inability to narrow the scope of insider-trading liability.

Unlike other examples of broad judicial interpretations of criminal statutes or common law wholly within the Judiciary's domain, the requirement that courts defer to agency interpretations of statutes under Chevron prevented them from significantly restricting the SEC's and the government's prosecutorial power.  See, e.g., McGee, 763 F.3d at 312–16 (applying Chevron in an insider trading case); Corbin, 729 F. Supp. 2d at 617–18 (same).  Thus, criminal insider-trading

---

The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

law developed as a form of common law driven by agency-interpretations, passing all accountability to the Judiciary for expanding the criminal definition of insider trading but allowing the SEC to wield substantial interpretive power to prevent the definition from narrowing.  See, e.g., McGee, 763 F.3d at 316 ("Although we are not without reservations concerning the breadth of misappropriation under Rule 10b5-2(b)(2), it is for Congress to limit its delegation of authority to the SEC or to limit misappropriation by statute.  It is not the role of our Court.").  Decisions extending the scope of insider trading law have repeatedly done so by creating sweeping new categories of illegal conduct that courts have never retracted.

Moreover, the Supreme Court has recently clarified that Chevron deference does not apply to agency interpretations of criminal statutes.  See Apel, 571 U.S. at 369 ("[W]e have never held that the Government's reading of a criminal statute is entitled to any deference."); Abramski v. United States, 573 U.S. 169, 191 (2014) ("The critical point is that criminal laws are for courts, not the Government, to construe."); see also Guedes v. BATFE, 140 S. Ct. 789, 790 (2020) (Gorsuch, J., concurring in denial of writ of certiorari) ("[W]hatever else one thinks about Chevron, it has no role to play when liberty is at stake.  Under our Constitution, '[o]nly the people's elected representatives in the legislature are authorized to 'make an act a crime.'"  (citing Apel, 571 U.S. at 369)).  Removing Chevron's hold on judicial interpretations greatly reduces the precedential value of prior deferential interpretations and places enormous significance on a more critical and precise review of the constitutional and statutory basis for criminal insider-trading prosecutions.  Accordingly, only judicial opinions focused on the text of the statute itself should govern Levoff's case.  See Wiltberger, 18 U.S. at 96 ("It would be dangerous, indeed, to carry the principle that a case which is within the reason or mischief of a statute, is within its provisions so far as to punish a crime not enumerated in the statute, because it is of equal atrocity, or of kindred character, with

those which are enumerated.").

For example, applying <u>Chevron</u> deference in <u>McGee</u>, the Third Circuit first found that Section 10(b) was ambiguous before reaching the second step of the analysis where the Court needed to defer to a reasonable interpretation by the SEC.  Now that the Supreme Court has held that <u>Chevron</u> does not apply to criminal statutes such as Section 10(b), the only viable remaining principle from <u>McGee</u> is the first step of its <u>Chevron</u> analysis—that Section 10(b) "does not mention insider trading at all, much less misappropriation or relationships required for liability." 763 F.3d at 313.

While many insider-trading cases have rejected the rule of lenity in favor of <u>Chevron</u> deference when interpreting Section 10(b) and Rule 10b-5, <u>see, e.g.</u>, <u>McGee</u>, 763 F.3d at 312–13 (applying <u>Chevron</u>); <u>Corbin</u>, 729 F. Supp. 2d at 617–18 (same); <u>United States v. Royer</u>, 549 F.3d 886, 889 (2d Cir. 2008) (citing <u>Roth ex rel. Beacon Power Corp. v. Perseus L.L.C.</u>, 522 F.3d 242, 249 (2d Cir. 2008) as "holding that SEC rules are entitled to <u>Chevron</u> deference")), recent Supreme Court decisions have rejected the application of <u>Chevron</u> when interpreting criminal statutes.[5] Justice Scalia explained that rejection in the Court's opinion denying certiorari in <u>Whitman v. United States</u>, 574 U.S. 1003, 1004–05 (2014), stating:

> With deference to agency interpretations of statutory provisions to which criminal prohibitions are attached, federal administrators can in effect create (and uncreate) new crimes at will, so long as they do not roam beyond ambiguities that the laws contain.  Undoubtedly Congress may make it a crime to violate a regulation . . . but it is quite a different matter for Congress to give agencies—let alone for us to *presume* that Congress gave agencies—power to resolve ambiguities in criminal legislation. . . . The rule of lenity requires interpreters to resolve ambiguity in criminal laws in favor of defendants.  Deferring to the prosecuting branch's expansive views of these statutes "would turn [their] normal construction . . . upside-down, replacing the doctrine of lenity with a doctrine of severity."

---

[5] <u>See</u> <u>Apel</u>, 571 U.S. at 369 (stating that courts need not defer to the government regarding criminal laws); <u>Abramski v. United States</u>, 573 U.S. 169, 191 (2014) (same).

Id. at 1004–05 (alteration in original); see also id. at 1005 ("[O]nly the *legislature* may define crimes and fix punishments.  Congress cannot, through ambiguity, effectively leave that function to the courts—much less to the administrative bureaucracy.").

The SEC's use of a catch-all regulation in Rule 10b-5 was designed to develop insider trading as a common-law crime to maintain a flexible approach to criminal insider trading.  "Useful as such an elastic and expedient definition [for insider trading] . . . may be in the civil context, it has no place in the criminal law.  Chestman, 947 F.2d at 570 (en banc) (reversing 10b-5 conviction); see also Milwaukee v. Illinois, 451 U.S. 304, 325 (1981) (finding that Congress authorizes agencies "possessing the necessary expertise" to regulate complex industries, which are "particularly unsuited to the approach inevitable under a regime of federal common law," due to the resulting "ad hoc" regulation).

Levoff's trading of Apple stock alleged in the Indictment does not violate any criminal statute.  Because the Constitution does not permit the creation of federal criminal common law, the Indictment fails to state a crime.  Welch, 136 S. Ct. at 1268 ("[O]nly Congress, and not the courts . . . can make conduct criminal."); Cent. Bank, 511 U.S. at 181 ("There is no federal common law of crimes . . . ."); Hudson, 11 U.S. at 33–34.

## **CONCLUSION**

For the foregoing reasons, the Indictment against Defendant Gene Levoff is unconstitutional and should be dismissed with prejudice.

Chatham, New Jersey
Dated:  April 27, 2020

Respectfully submitted,

MARINO, TORTORELLA & BOYLE, P.C.

By: _____

Kevin H. Marino
John D. Tortorella
Wan Cha
437 Southern Boulevard
Chatham, New Jersey 07928-1488
(973) 824-9300
*Attorneys for Defendant Gene Levoff*